STATE OF NEW YORK: COUNTY OF WESTCHESTER
CITY SCHOOL DISTRICT OF NEW ROCHELLE
----------------------------------------------------------------------X

In the Matter of Disciplinary Charges

               -against-                               REPORT OF FINDINGS

BROOKE BALCHAN,                                and
                    Respondent.

                                           RECOMMENDATION

Pursuant to §75 of the New York State Civil Service Law

----------------------------------------------------------------------X

       At the designation of the Board of Education (Ex. I) the above-entitled matter was referred to the undersigned to serve as Hearing Officer pursuant to Section 75 of the Civil Service Law.

APPEARANCES:

| | |
|---|---|
| For the Charging Party | INGERMAN SMITH, LLP |
| | By:  Gus Mountanos, Esq. |
| |      Emily J. Lucas, Esq. |
| |      Gabrielle Heffernan, Esq. |
| |      550 Mamaroneck Ave., Suite 209 |
| |      Harrison, New York 10528 |
| | |
| For the Respondent | GILBERT LAW GROUP |
| | By:  Howard E. Gilbert, Esq. |
| |      425 Broadhollow Rd. Suite 405 |
| |      Melville, New York 11747 |

       The hearing in this proceeding was originally scheduled for May 4 and 5, 2023.  On May 3, 2023, the Respondent, pro se, obtained a temporary restraining order from Westchester Supreme Court staying these proceedings.  On June 12, 2023, the Court denied an injunction. The Respondent's prior counsel had agreed that the hearing would reconvene on June 20, 2023. On June 16, 2023, the Respondent's prior counsel requested an adjournment because Dr. Balchan "was consulting with outside counsel."  That request was denied.  Within hours, the Respondent fired prior counsel.  On June 19, 2023, the Gilbert Law Group appeared on behalf of Dr. Balchan and requested a four-week adjournment to adequately prepare a defense.  The hearing was rescheduled, by agreement of the parties and their attorneys, to commence on July 25, 2023. The Respondent appeared with counsel on the scheduled date and time.  At the commencement of the hearing Respondent's counsel moved for a further adjournment.  During his argument in support of that application, Mr. Gilbert stated "…if the district proceeds, they're going to have to do so in absentia" (T. 9).  The application for a further adjournment was denied. Respondent's counsel then said to Dr. Balchan "Okay, let's go" (T. 24) and they walked out of the hearing together.  The hearing was conducted on July 25, September 7, September 14, and September 21, 2023, at City Hall.  There were no further appearances by counsel or the

Respondent on the subsequent dates which had been set by mutual agreement.  The undersigned presided on each hearing date and had an opportunity to review the complete transcript of the testimony before preparing this report.  Annexed hereto is the Hearing Officer's trial sheet of the seventy-seven exhibits presented at the hearing along with the original exhibits.  The original transcripts of the proceedings are in the possession of the Charging Party.

## CHARGES

Brooke Balchan was served with nineteen charges which allege misconduct, incompetence, insubordination, neglect of duty and dereliction of duty. (Ex. 1A).[1]

## TESTIMONY/EVIDENCE

Sabita Suraj Sookdeo

Ms. Sookdeo is a citizen of Trinidad where she resides with her husband and son (T. 63).  Ms. Sookdeo visited the island of Tobago[2] from September 22, 2022, to September 30, 2022 (T. 63).  Ms. Sookdeo testified that she met "Dr. Brooke Belchan through (her) husband, who are (sic) friends with Dr. Brooke's husband, Romel Balchan, and he is also friends with (her) husband's sister…who also works for the (New Rochelle) school district, and she was also previously married to Romel" (T. 64).  Ms. Sookdeo has known Dr. Balchan for ten years (T. 65).  Ms. Sookdeo had travelled to the United States from July 7, 2022, to August 22, 2022, spending time with the Respondent's family (T. 65; Ex. 2).  Sometime in early January 2023, Ms. Sookdeo sent an email to Dr. Corey Reynolds because of an article she read online (T. 66; Ex. 2).  Ms. Sookdeo averred "the article was…it was something about Brooke saying that the school district was against her about her trip in Tobago and I knew that not to be true" (T. 67; Ex. 1D).  Ms. Sookdeo testified that the article was not true "because Brooke was saying that she was on a Jewish holiday, and that is not true because my family and her family were on a vacation together" (T. 69).  After the email exchange in January 2023 (Ex. 2), Ms. Sookdeo has had no further communication with Dr. Reynolds (T. 72).

Ms. Sookdeo averred: "In early August Brooke and Romel approached us and they told my husband and I that they wanted to purchase a property in Trinidad… (Dr. Balchan) wanted to have a meeting with me about it…and so we set up a meeting.  She came over to where I was staying and she explained to me that she was going to win a lawsuit, get some money from a lawsuit, and she wanted to purchase a house in Tobago for investment purposes, possibly to live there in the near future.  So she asked me if I can assist with her and go with her to Tobago and maybe probably show them some options of the properties, because she seemed to think I knew about this" (T. 75).  The meeting took place in New York on August 12, 2022 (T. 75).  Ms. Sookdeo testified that Dr. Balchan "mentioned that her kids have never been to Trinidad and that's the country that her husband grew up in and she would like to make a vacation out of it, it's going to be adventurous because they've never been there and they haven't had a vacation in a long time…she mentioned that the trip was supposed to be…she would like to visit in September, and she asked me if my husband and I, we were…since she you (sic) wanted my family to be there, they will pay for it if we would accompany them" (T. 76-77).  Ms. Sookdeo asked Dr. Balchan if she was going to bring her boys since they would be back in school and Dr. Balchan "said, no she's just going to say that they have COVID and she really wants them to be

---

[1] CSL §75 only permits disciplinary action "for incompetency or misconduct."  Insubordination is a form of misconduct.  Neglect and dereliction of duty are elements of incompetence.

[2] One of the two islands making up the country of Trinidad and Tobago (T. 63).

on the vacation trip with her" (T. 78). Dr. Balchan never mentioned during the August 12, 2022, meeting that she was making the trip for religious reasons (T. 79). Ms. Sookdeo understood that Dr. Balchan would be booking multiple properties for the parties to stay in and that these were properties she was interested in purchasing (T. 80). On August 13, 2022, Dr. Balchan emailed Ms. Sookdeo a copy of the Respondent's family's flight itinerary (T. 80; Exs. 3A & 3B). Ms. Sookdeo testified that "there were constant phone calls back and forth all day about Tobago…so I created a group Chat on WhatsApp…so that we can all be on the same page…instead of calling each other separately, I created a group chat since I knew it was vacation we're going on, so I created it so that we can all share our ideas of what we're going to do, where we were going to stay in Tobago" (T. 83-86; Ex. 4). The group chat was also used to share photos from the vacation. Ms. Sookdeo testified that she took the photos depicted on pages 45-143 of Exhibit 4 during the September 2022 vacation with the Balchan family (T. 129). Ms. Sookdeo averred that "Brooke told us that her job doesn't know that she's there in Tobago, so (the Balchans) did not want us to post anything on social media to show that she was in Tobago with her and her family" (T. 127).

Ms. Sookdeo testified that her family arrived in Tobago on the same day as Dr. Balchan's family, on September 22, 2022 (T. 136-137). Ms. Sookdeo's family checked into the Airbnb where both families were staying prior to the Balchans (T. 139). The Balchans were picked up from the airport by Ms. Sookdeo's husband who drove them directly to the Airbnb, arriving around 3:30 p.m. (T. 142-143). Upon arriving Dr. Balchan said "I almost had to cancel my trip because of this man at work and that he was giving her a really hard time. And she mentioned something about a meeting she went to…and she said she handed some folders to some individuals in the meeting and they were acting like they didn't receive the folders…then she mentioned she got an email the day before she came there…and she said that the email came like after 5 p.m., and she's not gonna respond to it…she said, well, I'm on vacation. He, the person emailed me after my working hours. It's not…I'm not gonna reply to him. I'm going to reply when I'm ready to" (T. 143-144). The families then had an early dinner at the Sandy Point Beach Club from 4:00 to 6:30 p.m. (T. 145-146). The families enjoyed time by the pool at the Airbnb (T. 150; Ex. 6). Ms. Sookdeo testified that after they had all "settled in," the kids went to bed and the two adult couples "sat up drinking cocktails and talking" until about 10:00 p.m. (T. 154). Ms. Sookdeo averred that at no time on September 22, 2022, did she witness Dr. Balchan participating in any religious services, praying or conducting any religious activities (T. 155).

On September 23, 2022, the families got up at around 8:00 a.m. and had breakfast together (T. 155). Around 10:00 a.m. Dr. Balchan, her husband, and Ms. Sookdeo's husband left with a realtor to explore real estate opportunities (T. 156). They returned from this excursion around 12:30 (T. 157). The families had lunch and then went together on a three-hour boat tour (T. 160; Ex. 4, pgs. 48-79). Everyone returned to the Airbnb where they shared a takeout dinner (T. 169). After the children went to bed, the four adults stayed up "drinking some cocktails and talking" until about 10:00 p.m. (T. 169). Ms. Sookdeo testified that at no time on September 23, 2022, did she witness Dr. Balchan participating in any religious services, praying or conducting any religious activities (T. 169). At no time that day did Dr. Balchan indicate that she had religious obligations she needed to attend to (T. 170).

On September 24, 2022, the families went to breakfast together from around 9:00 a.m. to 11:30 a.m. (T. 170-171). After breakfast the families checked out of the Airbnb and moved to Seaside Garden Guesthouse which had been booked by Dr. Balchan on August 14, 2022 (T. 172-173; Ex. 7). Ms. Sookdeo testified that "Dr. Balchan said that this is the property that she

3

wanted to purchase, that she…well, she told me she put a down payment on the purchase, on this particular property" (T. 175).  After checking in, Ms. Sookdeo, Dr. Balchan and the children "went across to the beach" and they "spent the entire afternoon at the beach" (T. 179, 181).  Everyone returned to Seaside Gardens around 6:30 p.m. to get ready for dinner (T. 184).  Both families left for dinner around 7:00 p.m. (T. 184).  Ms. Sookdeo testified that during dinner Dr. Balchan said that "they arranged for a party on the beach the next day" (T. 186).  The families returned to Seaside Gardens around 10:00 p.m. and "just sat on the veranda and just hung out" (T. 187).  Ms. Sookdeo testified that at no time on September 24, 2022, did she witness Dr. Balchan participating in any religious services, praying or conducting any religious activities (T. 187).  At no time that day did Dr. Balchan indicate that she had religious obligations she needed to attend to (T. 187-188).

On September 25, 2022, the families had breakfast together at Seaside Gardens (T. 190).  Both families left the villa at around 9:00 a.m. to go to the beach party arranged by the Balchans (T. 190).  Ms. Sookdeo averred "we had a full day of activity.  We hung out…Brooke arranged paddle boarding, which she did.  We all drank while we were on the beach hanging out" (T. 190-191).  The families left the beach around 6:00 p.m. and returned to the villa (T. 196).  The families brought in takeout for dinner, eating together on the veranda (T. 198).  Ms. Sookdeo testified that "Brooke asked me if I could watch Baby Caura so she can attend Sunday Night School[3]…so I stayed back and everyone else went to Sunday Night School" (T. 198; Ex. 12, pgs. 19-24).  The families returned to the villa around 10:00 p.m. and Dr. Balchan had "a Caribbean Rose (cocktail) in her hand" (T. 201). Ms. Sookdeo testified that at no time on September 25, 2022, did she witness Dr. Balchan participating in any religious services, praying or conducting any religious activities (T. 202).  At no time that day did Dr. Balchan indicate that she had religious obligations after sunset (T. 202).

On September 26, 2022, the families got up around 8:00 a.m. (T. 202).  Dr. Balchan and her husband met with a realtor at the villa from 9:00 a.m. to 11:00 a.m. (T. 203). Ms. Sookdeo testified that after the meeting "we had to check out of Seaside villa and check into the third Airbnb, but it wasn't ready until 2 p.m.….we decided to do some sightseeing in the meantime" (T. 206).  The families remained together and subsequently checked in to Samaan Grove around 1:30 p.m. (T. 210).  At around 3:00 p.m., Dr. Balchan, her husband and Ms. Sookdeo's husband left with a realtor to view properties (T. 213-214).  The three adults returned around 5:00 p.m. (T. 214).  Subsequently, Dr. Balchan, her husband and Ms. Sookdeo's husband left for a Bioluminescence Tour which the Respondent had booked, returning around 10:30 p.m. (T. 215-216; Ex. 9).  Ms. Sookdeo testified: "While they was gone, Caura was awake and she cried all evening…I realized she needed her breast milk.  So I didn't have that…so I called all evening. She kept crying and crying all evening and I was just trying to get a hold of them to see what time they were coming back" (T. 217).  Ms. Sookdeo averred that she had researched the Bioluminescence Tour and averred that it was not religious in any way (T. 219-220).  Ms. Sookdeo testified that when Dr. Balchan returned home from the tour "I could visibly see that she was intoxicated, and I told her she needed to wake her baby and feed her, and because she was intoxicated, she didn't seem to care to do that" (T. 221).  "It was close to midnight" when the adults went to bed (T. 221).  Ms. Sookdeo averred that at no time on September 26, 2022, did she witness Dr. Balchan participating in any religious services, praying or conducting any religious activities (T. 221).  At no time that day did Dr. Balchan mention that it was Rosh

---

[3] "It's a party, it's loud music.  It's drinking…it starts from 7 p.m. until 4 a.m." (T. 197).

Hashanah (T. 221).  At no time that day did Dr. Balchan indicate that she had any religious observances to attend to (T. 222).

On September 27, 2022, the families were scheduled at 9:00 a.m. for a horseback riding tour which Dr. Balchan had booked for herself, her twins and Ms. Sookdeo's son (T. 223).  The tour is about two to three hours long (T. 224; Ex. 4, pgs. 131-134; Ex. 12, pg. 31).  After the horseback riding, the two families "hung out on the beach and …ate food" until about 3:00 p.m. (T. 236).  The two families then went to Pigeon Point until about 6:00 p.m. (T. 237, 242; Ex. 12, pg. 41).  Then the two families were at Skewers Grill for about two hours (T. 243).  After getting ice cream, the families returned to their accommodations around 9:15 p.m. (T. 244).  The adults stayed up talking until 11:30 p.m. (T. 250).  Ms. Sookdeo testified that at no time on September 27, 2022, did she witness Dr. Balchan participating in any religious services, praying or conducting any religious activities (T. 250).  At no time that day did Dr. Balchan mention that it was Rosh Hashanah (T. 250).  At no time that day did Balchan indicate that she had any religious obligations to attend to (T. 250).

On the morning of September 28, 2022, Ms. Sookdeo undertook to change the families' flight itineraries, extend the stay at the Airbnb and extend the car rental as the parties had decided to stay longer on Tobago (T. 250-253).  During the two hours it took to make these arrangements, Dr. Balchan "was going to send emails or do something of that sort and do something with work" (T. 253).  Both families left the villa around 11:15 a.m. to visit Castara Bay (T. 254).  The families left Castara Bay around 2:30 p.m. to return to the Airbnb, arriving about 4:00 p.m. (T. 256-257).  Ms. Sookdeo testified: "Brooke told me that she got an email from work.  She said she got an email from work from this man, who…she said she was gonna get back at this man who kept…for some reason this man kept harassing her…she mentioned something about the email, and she told me that he was like a misogynist and he was out to get her, and she's gonna get back at him so she was gonna reply to the email pertaining to that" (T. 258).  During dinner that evening Dr. Balchan and her husband said that they had made an offer on the villa in Seaside Gardens and the realtor had called to say that she could no longer represent them (T. 260-261).  Ms. Sookdeo averred: "so I said well, why?  They said they made an offer on the house.  And I asked well, what's the offer you made, and they said 1.5 million TT[4].  So I asked well, what's the price the house is going for?  They said 4.5 million TT.  I was just a bit shocked, so I was like are you an idiot?  How can you make an offer of 1.5 million TT on a 4.5 million dollar TT house?  It's not going to work.  So Brooke told us well, (the realtor) said she could no longer represent them because it's well under the budget and good luck at finding a property valued at 1.5 million TT" (T. 261).  The adults "stayed up drinking El Dorado Rum Cream" until about 10:00 p.m. (T. 262).  Ms. Sookdeo testified that at no time on September 28, 2022, did she witness Dr. Balchan participating in any religious services, praying or conducting any religious activities (T. 262).

After breakfast on September 29, 2022 "Brooke and Romel wanted to do some more sightseeing.  So we organized and we left and we went to Magdalena Beach Resort" (T. 264).  After that the families went to Bacolet Beach Club and toured the facilities (T. 266; Ex. 4, pgs. 136-143).  After the tour, the families ate lunch at the Café Havana (T. 267).  After a "couple hours" at the Café Havana the families "decided to go to Fort George and the museum" (T. 268-269).  "Brooke took the kids into the museum" while Ms. Sookdeo remained with Dr. Balchan's baby (T. 271).  The families then went to Swallow's Bay so that Dr. Balchan and her husband could look at property they were considering purchasing (T. 273).  Ms. Sookdeo testified: "The

---

[4] "The conversion rate is 6.89 TT to one US dollar" (T. 292).

only religion topic that came up (that day) was, so on Thursdays my husband, being a Hindu, he fasts every Thursday…well, we fast every Thursday.  So in the Hindu religion we don't really…we don't eat…they don't eat beef.  So Romel had a beef roti.  So my husband ask him (sic), how come you're eating beef and you're Hindu?  And he made a comment to him that he's always fasting.  So he asked Brooke about if they fast so and she said no.  He said, so what religion are you?  And she…said she's a Jew.  She's a Jewish woman.  So we didn't understand.  She didn't explain it.  So he said, well, what do Jewish people do?  And she told him that Jewish just offer bread into the water…he asked if she wanted to do it, 'cause he's willing to do anything religion-wise, and she didn't respond to him" (T. 276-277).  The families had dinner together at La Tartaruga and Dr. Balchan "had two bottles of wine" (T. 281).  The families returned to the Airbnb around 9:30 p.m. and went to bed around 10:00 or 11:00 p.m. (T. 282-283).  Ms. Sookdeo averred that at no time on September 29, 2022, did she witness Dr. Balchan participating in any religious services, praying or conducting any religious activities (T. 283).

At around 7:00 a.m. on September 30, 2022, Ms. Sookdeo's husband drove the Balchan family to the airport for a flight to Trinidad (T. 284).  Ms. Sookdeo's family followed soon after (T. 285-286).  The families said their goodbyes in the atrium of the airport in Trinidad (T. 286).  Ms. Sookdeo has not seen or spoken to Dr. Balchan since (T. 287, 295).  Ms. Sookdeo averred that at no time during the vacation in Tobago did she hear Dr. Balchan use the phrase "High Holy Days" (T. 295).  Ms. Sookdeo did not observe Dr. Balchan light candles at any time during the vacation (T. 295).  At no time during the vacation did Dr. Balchan prepare or request a meal to include apple and honey (T. 295).  When asked if Dr. Balchan bought or requested a challah bread, Ms. Sookdeo responded, "No. What is a challah bread.  Sorry.  I don't know" (T. 296).  Ms. Sookdeo averred that at no time during the vacation did Dr. Balchan say anything to the effect of "may you be written in the Book of Life" (T. 296).  At no time during the vacation did Ms. Sookdeo observe Dr. Balchan throw an object into the water (T. 296).  Ms. Sookdeo testified that there are no Jewish houses of worship in Tobago (T. 298).  Ms. Sookdeo averred that there is no Jewish community on Tobago and that Jewish holidays are not celebrated on Tobago (T. 298).

Dr. Corey Reynolds

Dr. Reynolds is currently the Superintendent of Schools.  At all times relevant to this proceeding Dr. Reynolds was the Assistant Superintendent for Human Resources (T. 314).  Dr. Reynolds testified that during the 2022-2023 school year the Health Services Department, which included all school nurses, was led by Dr. Balchan as Medical Director (T. 327).  The health services department was under the auspices of the Student Support Services Department, led by Dr. Joyner (T. 327).  The position of Lead Nurse served as a supplemental evaluator and supervisor for all the nurses in the District (T. 328).  On September 12, 2022, Dr. Reynolds directed the Respondent to attend a re-entry meeting on September 19, 2022, and advised her "please note that you will remain on administrative reassignment to home with full pay and benefits until our meeting on September 19, 2022" (T. 336; Ex. 18).  Dr. Reynolds averred that one purpose of the meeting was to "discuss with (Dr. Balchan) what the vision was for the position, for her returning to work that day…" (T. 347).  Dr. Balchan acknowledged the direction to attend in an email dated September 12, 2022: "Thank you very much for your letter and the invitation to next week's meeting.  I am looking forward to meeting with you all and planning for my return to the office" (T. 350; Ex. 23).  During the meeting, Dr. Reynolds reviewed the job responsibilities of the medical director as they existed prior to the 2022-2023 school year (T.

414-415; Ex. 32). The day after the meeting, Dr. Balchan emailed Traci Jackson complaining about Dr. Reynolds and the District's expectations of her as medical director (T. 351; Ex. 23). In a September 21, 2022, email to Traci Jackson, Dr. Balchan states "I would like to confirm that my approved personal days, starting tomorrow, are recorded as approved in AESOP, and that my first day to report to the office is 10/3/22…" (T. 354; Ex. 23). Shortly after receipt of this email, Dr. Reynolds notified Dr. Balchan that she is "not entitled to vacation time as a 10-month employee. Further, you cannot use 'personal days' for purposes of taking a vacation. Accordingly, to the extent that you wish to use these days for purposes of a vacation, your request is denied. Any usage of these days for vacation is strictly prohibited by the collective bargaining agreement" (T. 355; Ex. 23). On the same date, about forty-five minutes later, Dr. Reynolds followed up with another email to Dr. Balchan citing the specific provision of the collective bargaining agreement which governs requests for personal leave and requesting "the specific basis for your request for leave, in writing…" (T. 357; Ex. 24). The parties' collective bargaining agreement permits paid personal days for several reasons including "time necessary for the conduct of personal affairs which cannot normally be handled outside working hours, such as, performance of religious obligations…" (T. 363; Ex. 25). The CBA provides that "employees who accumulated fifty (50) or more days of leave for illness need not submit a statement of reasons for a maximum of two (2) days personal leave per year…." (Ex. 25). The Respondent had less than fifty days of sick leave at the beginning of the 2022-2023 school year and was, therefore, required to provide a 'statement of reasons.' Dr. Reynolds testified that the Respondent's contract prohibits her from using personal leave "for the day immediately preceding or immediately following a holiday period…unless prior approval is received from the Superintendent of Schools" (T. 364; Ex. 25). As a ten-month employee, Dr. Balchan was not entitled to any vacation days (T. 364). Dr. Balchan did not respond to Dr. Reynolds' email advising her she was not entitled to use leave time for her planned trip until September 28, 2022, when she had already been in Tobago for six days (T. 364; Ex. 26). Dr. Reynolds averred that many of the statements in Respondent's email are "false" and a baseless attack on his professional integrity (T. 367-370). Dr. Reynolds testified that Dr. Balchan "completely lied…about any verbal agreement with her request for personal days…that was never…expressed by any member in that room" (T. 375). Dr. Reynolds averred "we've never had any…administrator use all of their personal days in a contiguous manner" as Dr. Balchan proposed to do (T. 377). On October 2, 2022, Dr. Reynolds responded to Dr. Balchan's email (Ex. 27). In his response, Dr. Reynolds counseled, inter alia: "Dr. Balchan, the ability to interact professionally and appropriately with one's supervisors, as well as other staff members, is a critical component to the success of any of our employees. This is no less critically important in your role as the District's Medical Director. While you have every right to voice any employment concerns you may have, you must do so in a professional manner…" (Ex. 27). Dr. Reynolds testified that the Respondent's September 28, 2022, email "and the manner in which she was accusing me of misrepresenting information, accusing me of coming into a verbal agreement which would violate the contract, accusing me of retaliation and harassment and a hostile work environment were not grounded in truth, were not professional behavior" (T. 378).

Dr. Reynolds obtained Dr. Balchan's attendance records going back to 2018 (T. 383). Those records reveal that the Respondent never requested or used extended personal leave for the Jewish High Holy Days prior to 2022 (T. 395; Exs. 30A-F). Dr. Reynolds averred that a screenshot of Dr. Balchan's AESOP account on September 21, 2022, indicated that her request for five contiguous personal days were unapproved as they had been since the request was

entered on September 12, 2022 (T. 385-386; Ex. 29).  A meeting was held with Dr. Balchan on her return on October 3, 2022 (T. 405).  The meeting was audio-taped by both parties and the District subsequently produced a written transcript of the recording (T. 409; Ex. 31).  At the meeting, Dr. Balchan was presented with revised written job responsibilities of her position in an effort to accommodate objections she raised to extant job duties on September 19, 2022 (T. 411; Ex. 33).  Dr. Reynolds testified that during the meeting on October 3, 2022 "Dr. Balchan indicated to us which responsibilities she would not be performing, which we found to be out of the ordinary for any administrator or for any employee in the district.  As a matter of fact, she detailed which she did not find to be in her purview any longer, although many of these duties, if not all of them, were in her purview prior to her time away from the district" (T. 410).  Another meeting was scheduled for October 7, 2022, to discuss Dr. Balchan's recent unauthorized absences (T. 419; Ex. 34A).  The meeting took place as scheduled with Dr. Balchan and her union representative; an audio recording was made and transcribed (T. 420; Exs. 34B & 35).  During that meeting, Dr. Balchan was asked to provide specifics about her religious observance in Tobago; she asserted that on each day of the trip: "I attended a religious service, I reflected and planned and I prayed…throughout the day…this was a spiritual journey, and so incorporated in this trip included personal business and religious observance, so it intertwines…I previously explained this was a spiritual religious observance for my family to reflect and to plan for the upcoming year during this critical time" (Ex. 34B, pgs. 15-18).  Dr. Balchan couldn't recall when she viewed Dr. Reynolds' September 21, 2022, email advising that her leave request was not approved (T. 434).  Following the meeting, Dr. Reynolds sent Dr. Balchan an email directing her to provide "any and all documentation that you have concerning your trip to Trinidad and Tobago and the performance of your religious obligations and/or personal business that you tended to during this time.  This documentation should include: evidence of when this trip was scheduled, where the performance of your religious obligations took place, and the hours that you performed these religious obligations.  You are directed to produce this documentation to me no later than 4:00 pm on Wednesday, October 12, 2022" (T. 436; Ex. 36A).  The only documentation that Dr. Balchan provided in response to this directive was a copy of the flights she booked in August 2022 to Tobago for her family (T. 442; Ex. 36C).  Dr. Reynolds testified that the blog post by Robert Cox (Ex. 1D) contains "some very confidential information…it details letters and communications…from within the district, also includes documentation from our board president, William Iannuzzi.  It also has links to the actual recording of the two meetings on October 3rd and October 7th" (T. 449).  Dr. Reynolds averred that neither he nor any other administrator provided the information to Mr. Cox (T. 449-450).  On January 6, 2023, Dr. Reynolds received an unsolicited email from Sabita Suraj who had read the Cox article and found assertions by Dr. Balchan to be "untrue" (T. 451; Ex. 2).

On October 9, 2022, Dr. Balchan filed a "formal complaint" against Dr. Reynolds with the Superintendent and Board of Education alleging "religious discrimination" (T. 460; Ex. 39).  In response to the complaint, the District charged attorney Edward McCarthy with the responsibility of conducting an investigation (T. 462).  Dr. Reynolds cooperated with Attorney McCarthy's investigation, expending "between 20 and 25 hours" in that effort (T. 463).  Attorney McCarthy promulgated written findings on March 7, 2023 (T. 464; Ex. 40).  The investigatory findings conclude, inter alia, that Dr. Reynolds did not discriminate against Dr. Balchan and that Dr. Reynolds did not harass, bully, intimidate or demean Dr. Balchan (Ex. 40).  The investigation determined that Dr. Reynolds did not agree or approve of the requested personal days (Ex. 40).  Finally, Attorney McCarthy found that Dr. Reynolds had not engaged in

any pattern of retaliatory conduct against Dr. Balchan (Ex. 40).  On or about October 10, 2022, Dr. Balchan also filed a formal complaint against Dr. Reynolds and the District with the New York State Division of Human Rights (Ex. 41).  Dr. Reynolds averred that "between 90 to a hundred hours" were expended by the District in responding to Dr. Balchan's false complaint (T. 470).  The Respondent also brought a lawsuit in the State Supreme Court against Dr. Reynolds, the District and others in which she repeated her false claims regarding her Tobago trip and the administration's response (T. 471; Ex. 42).  Dr. Reynolds testified that Dr. Balchan had previously been formally counselled that "the District holds the expectation that as the administrator who serves as supervisor for the entire body of nurses within the City School District of New Rochelle, you will manage your behavior in an exemplary manner.  If you commit to similar behavior in the future, the District will impose strict disciplinary measures" (T. 485; Ex. 46).  One of the nurses under Dr. Balchan's supervision advised human resources that Dr. Balchan was refusing to approve her request for personal leave (T. 488; Ex. 47A).  Dr. Reynolds opined "that the behavior (refusing to approve) was closely related to (Dr. Balchan's) own issues that she had with the district…(it) was either self-serving or it was an attempt to be vindictive until her own personnel issues were resolved and that she would not approve anyone else's" (T. 490).  The District's Lead Nurse notified Dr. Reynolds on November 10, 2022, that "since early October (2022), the health services department (under Dr. Balchan) has been very chaotic" and detailing specific examples of the dysfunction (T. 502; Ex. 49).

On March 15, 2023, former superintendent Jonathan Raymond notified Dr. Balchan in writing that she was "administratively reassigned to home" (T. 507; Ex. 51).  The letter goes on to direct Dr. Balchan to remain off "any District property" without express written permission and to "refrain from discussing this matter with any staff members at this time" (Ex. 51).  Dr. Reynolds testified that he was advised that after receiving this letter Dr. Balchan attended a school event over the weekend (T. 509).

Dr. Reynolds averred that all employees have been trained in how to use AESOP.  Specifically, regarding requests for personal leave, employees are told "they must first seek approval by their immediate supervisor, in some instances it might need higher approval" (T. 519).  Based on her position as medical director, Dr. Balchan had to enter the request in AESOP and notify her immediate supervisor of the request, in no particular order (T. 521).

Traci Jackson

Ms. Jackson is the Executive Director of Human Resources (T. 552; Ex. 52).  Among other responsibilities, Ms. Jackson manages the district's absence data system (T. 554; Ex. 53).  Ms. Jackson attended the re-entry meeting with Dr. Balchan on September 19, 2023 (T. 560).  The intent was that this was the day that Dr. Balchan would return to work from home reassignment (T. 625).  Ms. Jackson was responsible for taking notes of the meeting (T. 562; Ex. 22).  Ms. Jackson averred that as Dr. Reynolds reviewed the job duties of the medical director, Dr. Balchan "pushed back" on several items discussed (T. 564).  Toward the end of the meeting, Dr. Joyner mentioned that there would be a team meeting on Thursday.  Ms. Jackson averred "that is when Dr. Balchan shared with us that she would not be here because she was taking personal days Thursday and Friday and all of the following week, and one of the reasons she said was because she's a new mom and she needs to make plans for child care and she's breastfeeding and she needed transition time away from the baby to come back to work" (T. 568).  Dr. Balchan never mentioned time off for religious observance or foreign travel (T. 626).  At no time during the meeting did Dr. Balchan request personal time from any administrator (T.

568).  The next day, Ms. Jackson received an email from Dr. Balchan (T. 571; Ex. 54).  Ms. Jackson testified that at no time during the meeting did Dr. Reynolds give her any directives as asserted in the email (T. 573; Ex. 54).  Dr. Balchan requested, in the email, that the meeting "reconvene" on October 3, 2022, upon her return, to review "specific details" (T. 574; Ex. 54).  Ms. Jackson averred that she observed nothing in the meeting on September 19, 2022, that led her to believe that Dr. Balchan was intimidated and/or stressed – "I remember she kept clicking her heels saying there's no place like home" (T. 574-575).  Ms. Jackson responded by email on September 21, 2022 (T. 576; Ex. 23).  An hour later Dr. Balchan sent an email to Ms. Jackson which concluded "lastly, as per our discussion, I would like to confirm that my approved personal days, starting tomorrow, are recorded as approved in AESOP, and that my first day to report to the office is 10/3/22…" (T. 576; Ex. 23).  Ms. Jackson testified that "was contradictory" because it referred to 'approved personal days' but Dr. Balchan wanted to confirm they were recorded as approved in AESOP (T. 577).  Any employee can look at their AESOP account and determine if requested days had been approved (T. 629).  Ms. Jackson entered Dr. Balchan's AESOP profile and determined that the requests for multiple personal days, made September 12, 2022, were not approved as Dr. Balchan had asserted (T. 579; Ex. 29).  After examining AESOP, Ms. Jackson recognized "multiple red flags" (T. 579).  "One, the way she presented it at our meeting on September 19th, was matter of fact, that they were approved, that she was taking them.  She never asked for approval for the days.  So here I found out that none of the days were approved.  Also travel abroad always sends up a red flag because according to the A&S contract, you cannot…one, she's a ten-month administrator, so she does not have vacation days, according to the contract language you cannot use personal days for travel, and then also the religion observance because…it wasn't discussed in the meeting, when she told us that she would be out.  I actually looked to see if she had taken any personal days since 2017 around a religious holiday and there's no record of that in AESOP…the first thing when you look and see there are five contiguous days…employees are not permitted to take more than three personal days without having written approval by the superintendent of schools" (T. 579-581).  Any employee of the District requesting personal leave must go through two levels of approval; the first level is the person's immediate supervisor and, if approved, the final approval comes from Ms. Jackson (T. 581).  Any employee requesting more than three consecutive personal days (as herein) must have written permission from the superintendent which Dr. Balchan did not obtain either before or after her trip to Tobago (T. 584).  Ms. Jackson advised Dr. Reynolds that Dr. Balchan's personal leave had not been approved and Dr. Reynolds sent two emails on September 21, 2022, notifying the Respondent that her request for personal leave was "denied" (T. 585; Ex. 24).  Dr. Balchan did not report to work on September 22, 23, 28, 29 or 30, 2022 (T. 585-586).  Referring to Dr. Balchan's email response a week later on September 28, 2022, Ms. Jackson averred that there was never an agreement or approval of personal leave at the September 19, 2022, meeting (T. 587; Ex. 26).  Ms. Jackson testified that she was unaware that Dr. Balchan was Jewish and determined that she had never requested the use of personal days for religious observance previously (T. 587).  Furthermore, the District calendar already included days off for Rosh Hashanah during the period when Dr. Balchan requested leave (T. 632).  On October 3, 2022, Ms. Jackson attended a follow up meeting to discuss Dr. Balchan's revised job responsibilities (T. 591).  Ms. Jackson averred that the meeting "was meant to be collaborative" and that Dr. Reynolds had taken some of the Respondent's feedback from the earlier meeting and revised her job responsibilities (T. 591).  "Overall it was a good meeting and at the end, (Dr. Balchan) actually thanked us for the meeting" (T. 592; Ex. 31, pg. 19).

On October 3, 2022, Ms. Jackson received notice of a meeting with Dr. Balchan scheduled for October 7, 2022 (T. 594; Ex. 34A). "The intent of this meeting actually was to gather more information about the days that she took because…the superintendent of schools could approve…" (T. 594). No one at the meeting raised their voice except Dr. Balchan who kept talking over Dr. Reynolds (T. 598). Other than providing a copy of her flight itinerary, Dr. Balchan never provided the other documentation as directed by Dr. Reynolds" (T. 600).

In November 2022 Dr. Balchan filed a "formal complaint" against her supervisor, Dr. Gail Joyner (T. 610; Ex. 57). The Respondent alleged that Dr. Joyner was creating "a hostile work environment" because she repeatedly asked Dr. Balchan at meetings if she was making an audio recording. Attorney Edward McCarthy was engaged by the District to conduct an investigation into Dr. Balchan's formal complaint (T. 612). On March 7, 2023, Attorney McCarthy filed "investigatory findings" concluding that Dr. Joyner had not harassed or disrespected Dr. Balchan and that Dr. Joyner had not created a hostile work environment (Ex. 58). On January 20, 2023, Dr. Balchan submitted a complaint of workplace harassment against her by "Gail" and a clerical employee under her supervision (T. 604; Ex. 55). Specifically, Dr. Balchan alleged that Sally Moss reported to her that "Natalie Ali has been eavesdropping on her conversations and bossing her around. This has made her feel uncomfortable working next to her and it has only been three days" (Ex. 55). The Respondent asserted in her complaint to the superintendent "I do not feel comfortable with Natalie Ali having ANY involvement with the Health Services Department. And I look to you to protect me from this ongoing harassment from my supervisor and her newly situated clerical staff member, Natalie Ali" (Ex. 55). In response to this complaint, Ms. Jackson and Kareem Ali conducted an investigation, starting with an interview of Sally Moss (T. 605). Ms. Jackson testified "when we interviewed Sally…she said it was pleasant to work in the Health Services Department…She said that Natalie Ali was very cooperative. She could always go to her. She described her as a go-getter, she said she was delightful and she had no complaints at all working with Natalie…eventually we got to the point where we actually asked her…whether she had ever reported to Dr. Balchan that Natalie Ali was harassing her and she quickly responded, she said never" (T. 608; Ex. 56). Ms. Jackson concluded after interviewing Sally "that what Dr. Balchan alleged was completely unfounded" (T. 609).

On January 25, 2023, Dr. Balchan filed another complaint with the superintendent against Dr. Joyner and blind copied the Board of Education (T. 614; Ex. 59). Ms. Jackson testified "I have to say I was disgusted by this email. I was really appalled by this email. One, she had been directed previously not to include the board on any of these back and forth communications…and then, the thing that stood out the most that really…I still get disgusted when I see this one, was the last sentence when she talked about her supervisor" (T. 615; Ex. 59). Specifically, Dr. Balchan characterized her supervisor, Dr. Joyner as follows: "Gail failed to demonstrate a skill level that I would have expected form (sic) an elementary student" (Ex. 59). Ms. Jackson averred that "this was the most unprofessional of all of her emails to date" (T. 615-616). A few days after Dr. Balchan was directed to remain off "any District property" (Ex. 51), Ms. Jackson was advised that the Respondent had been at the Albert Leonard Middle School (T. 618). Ms. Jackson subsequently received photos from the security cameras establishing Dr. Balchan's presence at a school sponsored event (T. 619; Ex. 60). The surveillance photos show Dr. Balchan arriving with her family but then walking through the crowd alone holding up a sign which reads 'zero tolerance for antisemitism' (T. 620; Ex. 60).

Ms. Jackson testified that the parties' collective bargaining agreement provides that any employee who has fifty or more days of accumulated leave doesn't need to submit a statement of reason for requested leave of up to two days (T. 635; Ex. 25). Dr. Balchan only had twenty-seven days of accumulated leave at the start of the 2022-2023 school year (T. 634; Ex. 30F). Ms. Jackson testified that under the circumstances, Dr. Balchan could not have used personal leave without getting approval (T. 636).

Kristina Goubeaud

Ms. Goubeaud is a registered nurse assigned to the Barnard School as well as serving as Lead Nurse (T. 647). As Lead Nurse, Ms. Goubeaud acts as the liaison between the nursing staff and the Health Services Department (T. 648). Dr. Balchan is Ms. Goubeaud's "direct supervisor" (T. 649). Upon her return in early October 2022 Dr. Balchan expressed concern about a schedule of meeting dates which had already been established in conjunction with Dr. Joyner (T. 649). Dr. Balchan "spent a lot of time reaching out to (Ms. Goubeaud) to discuss the dates" (T. 649). Ms. Goubeaud testified "when we kept having conversations about the meeting dates, I thought that was a time waster. In my opinion, it had already been set, and I felt that it was unnecessary to continue to have multiple conversations about the same topic…I was very busy at my own school that day, so it was taking me away from other responsibilities" (T. 650). In October 2022 several nurses called the Lead Nurse "regarding personal days that they had put in for in…AESOP, and those dates had been denied…by Dr. Balchan" (T. 651; Exs. 48, 61 & 62). Ms. Goubeaud averred that seven nurses were impacted by personal leave requests either being denied or not approved by Dr. Balchan (T. 655). There came a time in November 2022 that Ms. Goubeaud shared her concerns about Dr. Balchan with Dr. Reynolds and Traci Jackson (T. 657; Ex. 49). Ms. Goubeaud testified that she "was concerned because in the month or so since Dr. Balchan had been back, there was a lot of chaos. I really saw that there were a lot of conversations being had but no decisions being made…I was unsure of why (Dr. Balchan) was not making decisions. I was a little apprehensive…I just wanted to document things that were occurring because this was not in line with how it had been previously" (T. 658). At the beginning of the 2022-2023 school year the nurses received medical orders to allow them to administer Narcan and epinephrine in the case of an emergency (T. 660). Ms. Goubeaud averred that Dr. Balchan crossed out the orders and indicated that they were discontinued without providing valid substitute orders for ten days, leaving the nurses without medical authority to administer these lifesaving medications (T. 661). Ms. Goubeaud testified that there was nothing wrong with the original medical orders but thinks that Dr. Balchan "may have had a personal issue with (another doctor's) name being on them (T. 661-662). Dr. Balchan refused to support excluding a student who lacked all immunizations as required by state regulations as had been done consistently in the past (T. 664). Dr. Balchan refused to approve the expenditure of $65 to purchase extra sets of tubing for a special needs student requiring tube feeding (T. 664-665). On November 9, 2022, Ms. Goubeaud learned that a 911 call had been placed from the high school and that a student needed to be transferred to the hospital via ambulance (T. 667). "The high school administration…was questioning who would accompany the student in the ambulance…Dr. Balchan…sent an email and suggested a meeting and then a follow-up email and never came out and stated the protocols that had already been in place were that a nurse was not the one to accompany the student" (T. 667).

On December 2, 2022, Lead Nurse Goubeaud sent out an email reminder of a department meeting previously scheduled for December 5, 2022 (T. 670; Ex. 63). Dr. Balchan responded to

the email, copying all the nurses, and attaching a list of questions which had been directed to Dr. Joyner and were related solely to the Respondent (Ex. 43). Ms. Goubeaud averred that she "was very surprised that this was shared – that this was sent not only to me but shared with the entire nursing department, I thought it was completely inappropriate to share that with, again, myself and also all of the nurses. I felt that it was done intentionally to create confusion in the department and to undermine my role as the lead nurse…all of these items listed really are personal issues that were between Dr. Balchan and her supervisor…it just added to the stress and the chaos that was happening in the department since she had been back…" (T. 671-672, 674). Ms. Goubeaud testified "I wasn't sure what was going on with Dr. Balchan but this was really preventing us from – preventing me from doing my job and just taking up a lot of my time. And it didn't feel like we were working together as a team which it had been, it had felt like prior (T. 675-676). On January 17, 2023, Ms. Goubeaud emailed her supervisors advising them of the reason she was working overtime (T. 676; Ex. 64). Ms. Goubeaud had been assigned the responsibility for compiling the data for a State mandated BMI survey by Dr. Balchan "and it was very, very time-consuming" (T. 676). Ms. Goubeaud averred that in the past the Health Services clerical staff would collect the data that the nurses entered into the database (T. 678). Initially Dr. Balchan emailed the Lead Nurse on November 7, 2022, regarding the survey and Ms. Goubeaud responded that the clerical staff at Health Services is responsible for that and not the nurses (T. 679; Ex. 65). The Respondent indicated that she would check with Dr. Joyner (T. 679; Ex. 65). It wasn't until two months later, as the deadline for submission was several weeks away that Dr. Balchan assigned the task to Ms. Goubeaud (T. 679; Ex. 65). Dr. Balchan never assisted in the required survey, leaving the Lead Nurse to complete the task on her own (T. 681). Even so, Dr. Balchan questioned the justification for less than an hour of overtime and stated, "I did not authorize overtime for you to complete this task" (Ex. 64). Ms. Goubeaud testified "I felt that Dr. Balchan had tried to set me up from the beginning to fail at this task. We first talked about it in November. I didn't hear anything else about it until two months later. Now we're within the month window of that survey being due…Dr. Balchan said that she would assist me but never even looked at the Google sheet that I shared with her…So I did the online training and I got the information that I needed from some nice people at IT and I worked to get the information done for this survey" (T. 683). In early November 2022 the Health Services department was asked to staff Hugenot Academy, the alternative high school (T. 685). A meeting was held and a decision was made to place a nurse at Hugenot to collect data to determine the needs of the students (T. 685). Dr. Balchan never followed up until January 2023 when three meetings were held to discuss staffing Hugenot (T. 685). After the last meeting Dr. Balchan said she was not ready to make a decision about staffing because she had to meet with individual parties and she had to go to Hugenot to do her own assessment (T. 686). Ms. Goubeaud testified that Dr. Balchan asserted that she is not privy to the staffing and scheduling of the nurses "but that is simply untrue" (T. 687). Ms. Goubeaud was shown the email sent by Dr. Balchan on January 25, 2023 to the superintendent and Board of Education (Ex. 59). In that email, Dr. Balchan asserts, inter alia, that nurses at the meeting were "horrified" by how Dr. Joyner conducted herself (Ex. 59). Dr. Balchan goes on to purportedly quote numerous alleged criticisms by various nurses. Ms. Goubeaud averred that she had attended that meeting and that Dr. Joyner had not been "abusive" or "hostile" toward the Respondent as alleged (T. 691). No nurses contacted the Lead Nurse regarding that meeting (T. 692).

Leah Lugovina Freitas

Ms. Freitas is the Director of Guidance for the District (T. 696).  Ms. Freitas and Dr. Balchan are members of the student support services team along with four others (T. 698).  The team has meetings "about once a month" to discuss "how we're progressing with our goals, discuss maybe any challenges that we might be having.  A lot of team building goes on in those meetings" (T. 699).  Ms. Freitas testified that on one occasion Dr. Balchan arrived late to the meeting which had already started and "just began asking Dr. Joyner…questions" (T. 700).  Dr. Joyner asked if Dr. Balchan was recording the meeting and she said she was.  Dr. Joyner told Dr. Balchan she was excused and Dr. Balchan got up and left (T. 700).  Ms. Freitas averred that "I was really upset about the whole ordeal because…we had established ourselves as…a safe space…I was upset with Brooke" (T. 702).  Dr. Joyner did not yell at Dr. Balchan (T. 702).  Ms. Freitas testified that Dr. Joyner's conduct was not harassing or intimidating (T. 703).  Thereafter, Ms. Freitas "was very guarded at those meetings when Dr. Balchan was present…because I didn't trust that she was not recording…the conversations or the team meetings that we were having" (T. 703).

Kareem Ali

Mr. Ali is the staff assistant in the human resources department and has been an employee of the District for twenty-six years (T. 720).  Mr. Ali testified that during the 2022-2023 school year, Dr. Balchan was "responsible for approving or denying the absences for the nurses in the district as well as the clerical staff in her department" (T. 723-724).  Dr. Balchan has had the same responsibility since her hire in 2017 (T. 724).  In October 2022 Dr. Balchan raised questions about her responsibilities regarding attendance records so a meeting was scheduled for October 18, 2022 "to discuss AESOP and TimePiece and her responsibilities in both systems" (T. 725; Ex. 67).  Mr. Ali averred that "the purpose of the meeting was to give (Dr. Balchan) a refresher and update her on the changes that took place as well as discuss any responsibilities in AESOP" (T. 727-728).  Mr. Ali testified that during the one hour meeting he advised Dr. Balchan of the District's expectations for her related to AESOP: "The expectation was that Dr. Balchan would be responsible for reviewing the absence requests in the system, in AESOP, and she would be responsible for either approving or denying those absence requests" (T. 728).  Within a few days of the meeting, Mr. Ali "started receiving emails from nurses in the district who were inquiring as to why their days were not approved or denied" (T. 729).  On October 25, 2022, Mr. Ali was advised that Dr. Balchan told one of the nurses under her supervision that she does not have access to AESOP to approve her personal leave request (T. 731; Ex. 47A, Ex. 68).  Mr. Ali averred that Dr. Balchan did have such access in October 2022 and that issue had been discussed at the October 18 meeting (T. 731-732).  Mr. Ali checked the system on October 25, 2022, and confirmed that Dr. Balchan had, in fact, been successfully logging in to AESOP since October 2, 2022 (T. 733; Ex. 47A).  Inexplicably, on November 4, 2022, Dr. Balchan emailed Mr. Ali "I understand that I will be responsible for timepiece and aesop approvals for my department.  When can we set up training?" (T. 737; Ex. 69).  Mr. Ali testified that Dr. Balchan frequently approved personal days as far back as 2017 (T. 739).  On November 14, 2022, Traci Jackson emailed all administrators reminding them "that the district expects all Level 1 approvers to be committed to reviewing AESOP requests on a daily basis during the work day" (T. 740; Ex. 70).  The next day, Dr. Balchan continued to question her role regarding AESOP review for her staff (T. 742; Ex. 71).  The president of Dr. Balchan's union emailed Dr. Balchan "all administrators were directed to go into AESOP on a daily basis.  It is

our recommendation that you approve/disapprove AESOP for your direct reports (nurses and clerical staff)" (T. 743; Ex. 71). Ignoring the advice of her union president, Dr. Balchan asked the same question to her immediate supervisor (T. 744; Ex. 71). As a result of Dr. Balchan's ongoing inquiries, training was held on November 21, 2022 "for all administrators responsible for TimePiece to not only remind them of their responsibility and the importance of approving time in TimePiece…it was also to go over the procedures in TimePiece" (T. 747; Ex. 72). Mr. Ali averred that during the training, Dr. Balchan did not have any questions about using TimePiece (T. 750). Within minutes of completing this additional training, Dr. Balchan again questioned her responsibility for managing her staff's TimePiece records (Ex. 71). The following day, Dr. Balchan denied absence requests by her staff (T. 751; Exs. 61, 73, 74). Mr. Ali testified that because of Dr. Balchan's actions "there were days that were already taken being denied and removed (from the system). This caused a discrepancy in our attendance records for the staff in the (health services) department. We requested a list from Dr. Balchan of all the absences that she denied in the system so that we can start the process of restoring them, but we did not receive that list from her…we had to look at all the absences in the system for the staff in her department for a span of approximately four months" (T. 761-762). At least fifteen employees in Dr. Balchan's department were impacted by her conduct and three staff members in human resources spent at least twenty hours correcting the errors she created (T. 763). Mr. Ali averred that no other administrator in the district had a similar issue approving absences during the 2022-2023 school year (T. 763). As a second level approver, Mr. Ali disagreed with Dr. Balchan's reasons for refusing to approve requested days (T. 785). Ultimately, the responsibility for approving personal days and vacation days for health services staff was reassigned to the human resources department (T. 765). Mr. Ali testified that he sent all administrators an annual calendar of deadline dates for TimePiece approval and would send two emails each month reminding administrators of the deadline to submit approvals for a specific pay period (T. 773; Ex. 77). Mr. Ali averred that during the 2022-2023 school year, Dr. Balchan never approved her staff's daily attendance in TimePiece as required by all administrators (T. 770). As a result, Mr. Ali also became responsible for approving the time and the overtime for health services staff (T. 771). Mr. Ali participated in the interview with Sally Moss as part of the investigation into Dr. Balchan's complaint against Natalie Ali (T. 775; Ex. 55). Mr. Ali averred that "Sally praised Nalalie Ali tremendously during the meeting…she stated that Natalie was extremely helpful…she didn't find Natalie anything but helpful…when we specifically asked her if she ever filed a complaint with Dr. Balchan about Natalie Ali, she said no" (T. 779-780). Mr. Ali concluded after the investigation that the information provided by Dr. Balchan in her complaint was false (T. 787).

Mr. Ali testified that Dr. Balchan had been clearly counseled as to what her job responsibilities were concerning AESOP and TimePiece during the 2022-2023 school year and that she had received unambiguous directives in that regard (T. 783).

Vinod Michael Sookdeo

Mr. Sookdeo, who testified via Zoom, is the husband of a prior witness, Sabita Sookdeo (T. 791). Mr. Sookdeo first met Dr. Balchan through his acquaintance with her husband Romel when they requested that he assist in planning their wedding reception in Trinidad in 2010 (T. 793). Mr. Sookdeo accompanied his wife and son on a vacation with the Balchan family in Tobago between September 22 and September 30, 2022 (T. 794). Mr. Sookdeo's testimony of the day to day, hour by hour activities of Dr. Balchan during that vacation was entirely

consistent, and just as detailed, as his wife's testimony.  Notably, Mr. Sookdeo averred that at no time during the week-long vacation did he witness Dr. Balchan participating in any religious services, praying or conducting any religious activities (T. 815, 832, 843, 855-856, 872-873, 888, 905-906).  At no time during the week-long vacation did Dr. Balchan advise him that she needed to attend any religious activities during her stay (T. 815, 832, 843, 855-856, 872-873, 888, 905-906).  Mr. Sookdeo averred that prior to the trip Dr. Balchan did not advise him that the purpose of the trip was for religious celebration or religious activities but "said it was a vacation and an adventure" (T. 815).

Matthew Lucero

Mr. Lucero is the assistant principal at Albert Leonard Middle school (T. 910-911).  On March 20, 2023, the Principal of Albert Leonard asked Mr. Lucero to review surveillance footage from an event that had taken place on Sunday, March 19, 2023 (T. 913).  Mr. Lucero was asked to see if there was any footage of Dr. Balchan in the gymnasium (T. 913).  Mr. Lucero averred "I spent time skimming through the footage of the cameras through the gym and eventually did see footage of (Dr. Balchan) walking into the school with her family and…after she handed her children off to her husband, walk through the gym displaying a sign through the crowd…when her family entered the gym, she then walked through the stands displaying the sign out in a way to make sure that folks can see it, walking through the entire gymnasium…until she met up with her family" (T. 913-914; 916).  Mr. Lucero testified that there were about 1,000 people in the audience and Dr. Balchan was "promenading" through the crowd holding a sign which read "zero tolerance for antisemitism" in a way to ensure that the crowd could see the sign (T. 916-917).  Mr. Lucero produced screenshots from the video surveillance he personally reviewed (T. 918; Ex. 60).

Brooke Balchan

Although the Respondent knowingly absented herself from these proceedings and chose not to present any testimony in her defense, there is ample documentary evidence establishing her words, thoughts and intentions relative to the matters critical to a determination of her credibility and my findings of fact.  Sabita Sookdeo testified that Dr. Balchan acknowledged receiving Dr. Reynolds' letter of September 21, 2022, prior to her departure and that she intentionally chose to ignore it and to go to Tobago anyway.  It wasn't until September 28, 2022, that Dr. Balchan asserted in a responsive email that Dr. Reynolds had never indicated that her start date was September 19, 2022.  However, his letter (Ex. 18) clearly states that she is to attend a "re-entry" meeting on September 19, 2022 and that she will remain on "administrative reassignment to home…**until** our meeting on September 19, 2022…(emphasis added)."  Additionally, the notes of the September 19, 2022, meeting (Ex. 22), as well as the consistent testimony of several participants, establishes that Dr. Reynolds told the Respondent that the District was prepared for her to start on September 20, 2022.  It was at that juncture that Dr. Balchan stated that she was taking personal days starting on September 22, 2022.  At the re-entry meeting the Respondent was careful to avoid the truth – that she had entered a <u>request</u> for personal leave in AESOP but that it had not yet been approved. The evidence and testimony establish that at no time did Dr. Reynolds verbally agree that personal leave was approved as the Respondent asserted.  The several screenshots from AESOP adduced at the hearing establish that Dr. Balchan herself stated that the leave was for "pre-planned travel abroad" as well as for "religious observance."  Dr. Balchan first expanded on her planned religious observance in the

September 28, 2022, email (Ex. 26). She states: "You should be aware that I am a Jewish woman with a young family. The Jewish New Year, Rosh Hashanah, as well as Yom Kippur on 10/5, represents the holiest days of the year for Jewish people. This is a time of reflection for the year that has passed and for setting goals for the year to come. This time is very sacred to me, especially during this time of transition" (Ex. 26). In a meeting with human resources administrative staff on October 7, 2023, Dr. Balchan was asked if she had engaged in the performance of religious obligations on September 22, 2022. She stated, "I did preparations, yeah" (Ex. 34B, pg. 10). The Respondent asserted on that occasion that she had engaged in the performance of religious obligations on September 23, 29 and 30 as well (Ex. 34B, pg. 11). Dr. Balchan boldly embellished those falsehoods by asserting  "I attended a religious service, I reflected and planned and I prayed…throughout the day…this was a spiritual journey, and so incorporated in this trip included personal business and religious observance, so it intertwines…I previously explained this was a spiritual religious observance for my family to reflect and to plan for the upcoming year during this critical time" (Ex. 34B, pgs. 15-18). The Respondent filed a verified complaint in State court (Ex. 42) in which she falsely swears that her time in Tobago with her family was for religious observance. The Respondent falsely swore to similar statements in a complaint filed with the NYS Division of Human Rights (Ex. 41). The uncontroverted credible testimony and documentary evidence adduced at the hearing established that at no time during her stay in Tobago did the Respondent engage in any activity which could remotely be described as a part of a Jewish religious observance of the High Holy Days. Dr. Balchan claimed that she spent Rosh Hashanah attending a religious service and praying. In truth, on the evening of September 25, 2022, the start of Rosh Hashanah, the testimony and evidence establish that Brooke Balchan was drinking alcoholic beverages while listening to steel band music at a street party ironically named Sunday Night School outside a bar on a beach. On the first day of Rosh Hashanah, September 26, 2022, Brooke Balchan was nowhere near a religious service, having spent hours meeting with two different realtors and touring several properties for sale; having gone sightseeing in Buccoo Bay (Ex. 12, pg. 27); having taken a nighttime kayaking tour and drinking alcoholic beverages throughout the day. On the second day of Rosh Hashanah, Brooke Balchan continued to avoid any religious observance, opting instead for a two- and one-half hour horseback ride (Ex. 4, pg. 131) and for an entire afternoon on the beach; finishing with a dinner at Skewers. The outrageous hypocrisy and falsehood of her assertions of religiosity, which were repeated publicly and in court filings for months after, was established a hundred-fold by the photographs and detailed eye-witness testimony of how Dr. Balchan actually spent every minute of her time in Tobago. There was not one minute when the Respondent was engaged in anything remotely religious. Her attendance records reveal that this period of "sacred" reflection was an apparent novelty to Dr. Balchan, as she never before needed additional personal time for observance of the High Holy Days. And certainly not in a tropical resort.

Dr. Balchan stated in the October 7, 2022 meeting that even though she had booked her trip to Tobago on August 13, 2022 (Ex. 36C), she did not request personal leave until September 12, 2022 "because I was suspended until I received your letter dated September 12th that I was reassigned to home, and at that time, once I was assigned, reassigned to home, I was instructed to follow past practice for entering absences" (Ex. 34B, pg. 9). This assertion belies what she unequivocally knew to be true as of the August 31, 2022, letter Dr. Balchan acknowledged receiving from Dr. Reynolds. In that letter, Dr. Reynolds states "Please continue to follow your assignment to home and the same provisions and practices in relation to sick and personal day

requests expected of you prior to June 1, 2022…" (Ex. 36A).  Dr. Balchan claimed that she couldn't recall when she saw Dr. Reynolds' September 21, 2022, email advising that her personal leave was not approved even though she told her friend Sabita Sookdeo about the contents of the email the very next day.  Dr. Balchan went further and told her friend that she almost didn't make the trip because of the email, demonstrating an acknowledgement that the travel had not been authorized. In order to hide her whereabouts from the District, Dr. Balchan instructed her friends not to post about the trip on social media.

Dr. Balchan falsely swore when she affirmed in a complaint to the State Division of Human Rights that her time in Tobago was for "religious observance" and when she falsely affirmed that those days had been approved by her supervisor when she knew they had not.  Dr. Balchan again swore falsely months later when she filed and served a complaint against Dr. Reynolds and others in the State Supreme Court.  Dr. Balchan falsely avers in that complaint, inter alia, that her trip to Tobago "had significant spiritual and religious significance" (Ex. 42).

Evidence of the Respondent's insubordination is prolific throughout the record.  By way of example, and not limitation, Dr. Balchan objected to performing job responsibilities which had been defined by the Board of Education prior to the 2022-2023 school year.  Dr. Balchan ignored the superintendent's directive to remain off school property by appearing at a school function only four days after receiving the directive.  The Respondent refused to provide all the documentation directed by Dr. Reynolds regarding her unauthorized use of leave time.  The Respondent callously took out her anger on numerous members of her staff by willfully refusing to fulfill her responsibilities as a Level 1 approver in the attendance system after being specifically instructed and directed to do so by several administrators and the president of her union.  The testimony and evidence adduced established that Brooke Balchan supplanted her medical duties and obligations to the students in the District with a vicious campaign of vindictive reprisals and unjustified refusals to fulfill her critical duties as Medical Director.

## DISCUSSION

The certainty of words depends upon the integrity of the speaker.  I had the unique opportunity to observe the testimony of the witnesses.  In so doing, I considered the following factors in weighing each person's testimony: the interest or lack of interest of the witness in the outcome of the proceeding; potential bias or prejudice on the part of the witness; the opportunity the witness had to observe the facts about which she/he testified; the probability or improbability of the witness' testimony when considered in the light of all of the other evidence; and the appearance, sincerity, demeanor and manner in which the witness gave testimony – "all the nuances of speech and manner that combine to form an impression of either candor or deception."  (*Matter of Berenhaus*, 70 N.Y. 2d 436 [1987])

C.S.L. §75 provides that "compliance with technical rules of evidence shall not be required" at this hearing.  Even so, it is well settled that an employee facing disciplinary charges pursuant to C.S.L. §75 is entitled to be fully apprised of the allegations against her, with the concomitant opportunity to cross-examine witnesses, inspect documents and offer evidence in rebuttal or explanation. (*Matter of Simpson,* 38 NY2d 391 [1975]) The Respondent was served with charges and specifications advising her of the allegations in a timely manner prior to a hearing scheduled for May 4, 2023.  Shortly before the commencement of the hearing Respondent, pro se, obtained a temporary restraining order staying this proceeding until June 12, 2023.  Counsel for both parties agreed that the hearing would then commence on June 20, 2023.

On June 16, 2023, Dr. Balchan discharged her attorney. On June 19, 2023, the Gilbert Law Firm appeared on behalf of the Respondent and requested a more than one month adjournment to adequately prepare a defense. Counsel also requested a schedule for service of a proposed demand for particulars. Respondent's counsel served a demand for a bill of particulars (Ex. A) to which the Charging Party timely responded (Ex. 1B). The parties and their attorneys agreed on fixed dates for the commencement and continuation of the hearing. The hearing was scheduled to commence on July 25, 2023. The Respondent appeared on the scheduled date and time with two attorneys from the Gilbert Law Group. At the commencement of the hearing, Dr. Balchan's counsel moved for a further adjournment. After that application was denied, Mr. Gilbert left the hearing with the Respondent. Dr. Balchan was not present thereafter at any of the hearing dates which had been fixed by mutual agreement.

Dr. Balchan had nearly three months to prepare a defense to the pending charges. Dr. Balchan and her attorneys unilaterally, voluntarily, knowingly, and deliberately chose to allow these proceedings to go forward in absentia. After the first day of the hearing, I invited Dr. Balchan, through counsel, to return at the next scheduled hearing date (Ex. II). There were no subsequent appearances by Respondent or her counsel. Every opportunity was given to Dr. Balchan to adequately prepare for the hearing. All the dates were established by agreement of all counsel without objection from the parties. All the circumstances establish that Dr. Balchan knowingly and willingly waived her right to be present at the hearing, to cross-examine witnesses and to present a defense to the charges.

In New York State, outside New York City, private sector employees are considered "at will" employees. Generally, an employer may fire an "at will" employee for any reason or no reason. Some private sector employees are protected by language in their individual contract or a collective bargaining agreement which may restrict an employer's right to discharge except for "just cause." "Just cause" is an antipode of "at will" employment. In those circumstances, "just cause" imposes an obligation for the employer to provide an employee with due process through arbitration or a defined procedure to challenge the existence of "just cause." In other words, before an employer may take disciplinary action, the employee must have notice of the employer's reasonable job expectations; there must be an objective investigation of the employee's conduct; there must be evidence of incompetence, insubordination or other misconduct; and there must be sufficient notice of the charges and an opportunity to be heard in defense. The evidence found at the hearing established that each of these criteria, and more, was fulfilled by the District. The provisions of CSL §75 provide most public sector employees codified protection from disciplinary action by an employer except for just cause. In the instant circumstances, Dr. Balchan's collective bargaining agreement (Ex. 25) specifically provides "Unit members who serve in positions not eligible for tenure shall not be dismissed from their positions after satisfactory completion of three years of service…except for just cause." The collective bargaining agreement does not set forth a specific method for conducting the requisite "just cause" hearing. The Charging Party instituted this just cause proceeding pursuant to CLS §75 without any objection from the Respondent or her union attorney. The Gilbert Firm appeared in this §75 proceeding on behalf of Dr. Balchan; participated in the scheduling of hearing dates; and served a demand for particulars regarding the charges presented pursuant to CSL §75. The Gilbert Firm even captioned its demand for particulars as a CSL §75 proceeding. It is beyond dispute that the instant proceeding afforded the Respondent the full panoply of due process rights so that she could appropriately and fully challenge the employer's asserted "just

cause" for bringing the instant charges as guaranteed by the parties' collective bargaining agreement.

The Respondent's failure to testify permits me to draw all adverse inferences which may fairly be inferred from the evidence adduced at the hearing. (*Matter of Dean*, 158 AD2d 772 [3rd Dept, 1990]).  I have drawn all such inferences herein.

Prior disciplinary charges (Ex. 16) and prior findings (Ex. 17) are not probative of whether Dr. Balchan actually engaged in the conduct alleged by the Charging Party, and I have not considered either document in making my findings of fact in that regard.  Both documents, along with a letter of reprimand (Ex. 21) are probative of the issue of notice to Dr. Balchan regarding her job responsibilities and the conduct expected of her by the District.  A counseling memo dated January 29, 2019 (Ex. 46) states "the District holds the expectation that as the administrator who serves as supervisor for the entire body of nurses within the City School District of New Rochelle, you will manage your behavior in an exemplary manner."  This memo is not probative of whether Dr. Balchan engaged in the conduct alleged in the charges but is relevant and material on the issue of prior notice.

Sabita Sookdeo presented her testimony in a calm, straightforward manner.  Her unadorned recitation of the first-hand observations made during a weeklong vacation with the Respondent's family reminded me of fictional Sgt. Joe Friday's admonition, "just the facts, ma'am."  Ms. Sookdeo's precise recollections were corroborated by significant documentary and photographic evidence.  Ms. Sookdeo expressed no animus toward Dr. Balchan, and no such bias was evident in any of her testimony.  Her uncontroverted explanation as to why she came forward in this matter is not inconsistent with the integrity and humanity which Ms. Sookdeo's testimony revealed.  The probative value of Ms. Sookdeo's testimony is focused entirely on Dr. Balchan's public assertion that she was being persecuted for her religious convictions because, according to Respondent, she had taken time off from work for religious observance.  I found Ms. Sookdeo to be a highly credible witness and I accord the highest weight to her relevant testimony.

Dr. Corey Reynolds testified in a calm and reflective manner.  His testimony revealed that he is a "details" person as many of his responses provided substantially more factual information than called for by the original question.  Even so, there was a complete absence of exaggeration or hyperbole evident in Dr. Reynolds' answers.  Dr. Reynolds exhibited no animus toward the Respondent, although her personal attacks against him would have provoked such sentiments in others.  The audio tape of his meeting with Dr. Balchan belied her subsequent fraudulent characterizations of what transpired.  The transcripts of two of the initial meetings with Dr. Balchan reveal that Dr. Reynolds interacted with the Respondent respectfully and professionally throughout.  Dr. Reynolds' testimony was consistent with what the documentary evidence revealed about his approach to dealing with Dr. Balchan since August 2022 – thorough, objectively professional, and devoid of sentiment.  I found Dr. Reynolds to be a highly credible witness and I have accorded the highest weight to his testimony.

Traci Jackson was very relaxed throughout her testimony and made excellent eye contact with her interrogator.  Ms. Jackson was thoughtful and deliberate, and her answers were laser focused with no extraneous information.  Ms. Jackson offered significant and probative evidence of the Respondent's insubordination and incompetence.  I found Ms. Jackson to be a highly credible witness and I accord the highest weight to all her testimony.

Kristina Goubeaud presented as a reluctant witness.  She was very cautious in her responses, which were devoid of any hint of exaggeration or fabrication.  Ms. Goubeaud

provided first-hand evidence of the Respondent's insubordination and incompetence, although she did so without any enthusiasm or animus.  I found Ms. Goubeaud to be a highly credible witness and I accord the highest weight to her testimony.

Leah Lugovina Freitas' eyewitness testimony was limited to one meeting of the student support services team at which she observed the interaction between the Respondent and Dr. Joyner.  Her succinct account entirely contradicted the version of events Dr. Balchan falsely reported.  I found Ms. Freitas to be a highly credible witness and I accord the highest weight to her testimony.

Kareem Ali was poised and calm throughout his testimony.  Mr. Ali was directly involved in many of the interactions with Dr. Balchan regarding her responsibilities pertaining to AESOP and TimePiece.  Although not qualified as an expert witness, it was obvious throughout his examination that Mr. Ali is, in fact, an expert in all things AESOP and TimePiece.  Mr. Ali also had first-hand knowledge regarding the investigation of Dr. Balchan's written complaint against a clerical staff member concluding that the Respondent's allegations were false.  I found Mr. Ali to be a highly credible witness and I accord the highest weight to his testimony.

Vinod Sookdeo was very soft spoken and deliberate.  He seemed to carefully consider his responses which he provided in a succinct, unadorned manner.  His first-hand account of Dr. Balchan's activities between September 22 and September 30, 2022, was extremely probative and corroborated by substantial documentary and photographic evidence.  I found Mr. Sookdeo to be a highly credible witness and I accord the highest weight to his testimony.

Matthew Lucero provided an eyewitness account of the surveillance video showing that Dr. Balchan was knowingly disobeying a directive to remain off school property.  His testimony was delivered professionally, without hyperbole, and without extraneous commentary.  I found Mr. Lucero to be a highly credible witness and I accord the highest weight to his testimony.

Although Brooke Balchan voluntarily waived her right to appear and present testimony, her falsely sworn complaints filed in State Supreme Court and with the NYS Division of Human Rights were introduced at the hearing.  The Respondent's exaggerations, false characterizations and lies were front and center throughout the hearing as evidenced by the transcripts of two meetings with administrators; a seemingly unending stream of vitriolic, mendacious emails; and multiple written internal false complaints.  *Falsus in uno, falsus in omnibus* means "false in one thing, false in everything."  It is a legal maxim recognizing that a person who speaks falsely about one thing may be assumed to speak falsely about everything.  Aesop (the original, non-digital one) put it this way, "A liar will not be believed even when he speaks the truth."  Brooke Balchan's unabashed willingness to falsely swear on at least two occasions in different venues; her numerous falsehoods to District personnel; and her baseless public accusations of antisemitism speak not only to her absolute lack of verisimilitude but her unprincipled nature devoid of any moral foundation.  Her vicious, baseless assaults on the character of District staff are vindictive projections of her own venal constitution.  I find that Brooke Balchan is an alien to honesty and a stranger to the truth.

I resolve all disputed issues of fact in favor of the charging party.

## **FINDINGS**

Misconduct "requir(es) a showing of willfulness or intentional misconduct" (*Matter of Weatherlow v. Jamestown C.S.D.*, 236 AD2d 855, 856 [4th Dept 1997]).

"A finding of incompetence…only requires evidence of some dereliction or neglect of duty" (*Matter of Phillips v LePage*, 4 AD3d 704, 705 [3d Dept 2004]).

Insubordination, a specific form of misconduct, entails a willful disobedience or a persistent unwillingness to abide by a superior's directive (*Matter of Short v Nassau Co.*, 45 NY2d 721, 723 [1978]).

Penal Law §210 defines the term 'swear falsely' to be when a person "intentionally makes a false statement which he does not believe to be true…(b) under oath in a subscribed written instrument." The false swearing is considered complete when the document is filed or published. A person is guilty of perjury when she swears falsely.

'Substantial evidence' has been defined as such relevant proof as a reasonable mind may accept as adequate to support a conclusion or ultimate fact. (*Matter of Berenhaus v. Ward*, 70 NY2d 436, 443 [1987]). It is less than a preponderance of the evidence. (*300 Gramatan Ave Assoc v. State Div of Human Rights,* 45 NY2d 176, 180 [1978]).

It is beyond cavil that to perform the essential functions of a Medical Director, Dr. Balchan must be present within the District. (*Corr v. MTA*, 27 F. Supp2d 359 [EDNY, 1998])

A willful failure by an employee to comply with an established absence reporting protocol is evidence of misconduct. (*Matter of McKinnon v. North Bellmore*, 273 AD2d 240, 241 [2d Dept, 2000]).

I find that the Charging Party has established by substantial credible evidence specifications A-F of Charge 1.

I find that the Charging Party has established by substantial credible evidence specifications A-K of Charge 2.

I find that the Charging Party has established by substantial credible evidence specifications A-C of Charge 3.

I find that the Charging Party has established by substantial credible evidence specifications A-D of Charge 4.

I find that the Charging Party has established by substantial credible evidence specifications A-C of Charge 5.

I find that the Charging Party has established by substantial credible evidence specifications A-G of Charge 6.

I find that the Charging Party has established by substantial credible evidence specifications A-F of Charge 7.

I find that the Charging Party has established by substantial credible evidence Charge 8.

I find that the Charging Party has established by substantial credible evidence specifications A-I of Charge 9.

I find that the Charging Party has established by substantial credible evidence specifications A-I of Charge 10.

I find that the Charging Party has established by substantial credible evidence specifications A-L of Charge 11.

I find that the Charging Party has established by substantial credible evidence specifications A-C of Charge 12.

I find that the Charging Party has established by substantial credible evidence specifications A-C of Charge 13.

I find that the Charging Party has established by substantial credible evidence specifications A-I of Charge 14.

I find that the Charging Party has established by substantial credible evidence specifications A-E of Charge 15.

I find that the Charging Party has established by substantial credible evidence specifications A-C of Charge 16.

I find that the Charging Party has established by substantial credible evidence specifications A-D of Charge 17.

I find that the Charging Party has established by substantial credible evidence specifications A-D of Charge 18.

I find that the Charging Party has established by substantial credible evidence specifications A-C of Charge 19.

I find that the Charging Party has established by substantial credible evidence that the parties' collective bargaining agreement provides that Respondent could only use personal leave for the performance of religious obligations if they could not be handled outside working hours.

I find that the Charging Party has established by substantial credible evidence that all employees of the District were provided time off from work to perform Jewish religious obligations on September 26 and 27, 2022.

I find that the Charging Party has established by substantial credible evidence that the parties' collective bargaining agreement provides that leaves of absence shall not be granted for the day immediately preceding or immediately following a holiday period except for personal illness or death in the immediate family, unless prior approval is received from the Superintendent of Schools.

I find that the Charging Party has established by substantial credible evidence that Respondent was absent from her job responsibilities the day before and the day after the holiday period of September 26 and September 27, 2022, without the approval of the Superintendent of Schools.

I find that the Charging Party has established by substantial credible evidence that on September 12, 2022, Brooke Balchan accessed the Aesop attendance reporting system and requested personal leave for September 22, 23, 28, 29 and 30, 2022 indicating it was for "religious observance" and "pre-planned travel abroad."

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan's request for personal leave from September 22 through September 30, 2022, was never approved.

I find that the Charging Party has established by substantial credible evidence that the day before leaving on September 22, 2022, for Tobago, Brooke Balchan was advised in writing that her request for personal leave had not been approved.

I find that the Charging Party has established by substantial credible evidence that the day before leaving for Tobago, Brooke Balchan was advised in writing that the use of leave time as requested was prohibited by the parties' collective bargaining agreement.

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan intentionally and willfully refused, without justification or just cause, to perform her duties as Medical Director on September 22, 2022; September 23, 2022; September 28, 2022; September 29, 2022, and September 30, 2022.

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan willfully engaged in theft of time from the District when she intentionally was absent without leave from September 22, 2022 through September 30, 2022.

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan falsely represented to District administrators that her days out of the District were "approved" personal leave.

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan willfully ignored the directive of an assistant superintendent on September 21, 2022, that her leave request had not been approved and was "strictly prohibited" by the parties' collective bargaining agreement.

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan willfully refused to cancel her trip on September 21, 2022, when an assistant superintendent directed that she was not authorized to use leave.

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan willfully breached the parties' collective bargaining agreement when she was absent without leave from September 22, 2022, through September 30, 2022.

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan willfully impeded a District investigation into her absences without leave by providing false statements.

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan willfully refused to comply with the directive of an assistant superintendent that she provide documentation to support her claim that her absences without leave were for religious observance or some other purpose authorized by the parties' collective bargaining agreement.

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan willfully filed a knowingly false and malicious formal complaint of religious discrimination and harassment against Dr. Corey Reynolds; maliciously and libelously attacking him as antisemitic.

I find that the Charging Party has established by substantial credible evidence that as a result of the Respondent's fraudulent formal complaint, the District was required to needlessly expend time, money and personnel resources to conduct an investigation, which concluded the allegations were unfounded.

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan, on or about October 12, 2022, filed a verified complaint with the New York State Division of Human Rights in which she swears falsely that Dr. Reynolds "denied me an accommodation for my religious practices;" "denied me leave time or other benefits;" and "harassed or intimidated me."

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan, on or about October 12, 2022, filed a verified complaint with the New York State Division of Human Rights in which she swears falsely that Dr. Reynolds discriminated against her because she is Jewish.

I find that the Charging Party has established by substantial credible evidence that at no time during the 2022-2023 school year did Dr. Reynolds or any other employee of the District discriminate against Brooke Balchan.

I find that the Charging Party has established by substantial credible evidence that at no time during the 2022-2023 school year did Dr. Reynolds or any other employee of the District harass or intimidate Brooke Balchan.

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan, on or about October 12, 2022, filed a verified complaint with the New York State Division of Human Rights in which she swears falsely that Dr. Reynolds provided verbal approval of her leave request for religious observance.

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan, on or about October 12, 2022, filed a verified complaint with the New York State Division of Human Rights in which she swears falsely that Dr. Reynolds, on September 21, 2022, denied previously approved personal leave for religious observance.

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan, on or about October 12, 2022, filed a verified complaint with the New York State Division of Human Rights in which she swears falsely that her time in Tobago from September 22 through September 30, 2022, was "sacred" to her Jewish religious observance.

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan, on or about October 12, 2022, filed a verified complaint with the New York State Division of Human Rights in which she swears falsely that Dr. Joyner approved her request for personal leave for religious observance after she had returned from Tobago.

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan filed a verified complaint in New York State Supreme Court on or about March 14, 2023, in which she swears falsely that her trip to Tobago from September 22 through September 30, 2022 was for "religious observance" and that the trip had "significant spiritual and religious significance" to her.

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan filed a verified complaint in New York State Supreme Court on or about March 14, 2023, in which she swears falsely that her time in Tobago from September 22 through September 30, 2022 was "very sacred" to her as a "Jewish woman."

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan filed a verified complaint in New York State Supreme Court on or about March 14, 2023, in which she swears falsely that her religious observance from September 22 through September 30, 2022 was part of her "sincerely held religious beliefs, center to the core of her existence."

I find that the Charging Party has established by substantial credible evidence that at no time when Brooke Balchan was outside the District from September 22 through September 30, 2022, did she perform any religious obligation or participate in any religious observance.

I find that the Charging Party has established by substantial credible evidence that during the evening of September 25, 2022, the start of Rosh Hashanah, Brooke Balchan did not attend any religious service or undertake any religious observance.

I find that the Charging Party has established by substantial credible evidence that during the evening of September 25, 2022, the start of Rosh Hashanah, Brooke Balchan was in Tobago drinking alcoholic beverages while listening to live steel band music at a street party outside a bar on a beach.

I find that the Charging Party has established by substantial credible evidence that on the first day of Rosh Hashanah, September 26, 2022, Brooke Balchan did not attend any religious service or undertake any religious observance.

I find that the Charging Party has established by substantial credible evidence that on the first day of Rosh Hashanah, September 26, 2022, Brooke Balchan met with two different realtors and toured several properties for sale in Tobago.

I find that the Charging Party has established by substantial credible evidence that on the first day of Rosh Hashanah, September 26, 2022, Brooke Balchan went sightseeing to Buccoo Bay, Tobago.

I find that the Charging Party has established by substantial credible evidence that on the night of September 26, 2022, the start of the second day of Rosh Hashanah, Brooke Balchan did not attend any religious service or undertake any religious observance.

I find that the Charging Party has established by substantial credible evidence that on the night of September 26, 2022, the start of the second day of Rosh Hashanah, Brooke Balchan went on a kayaking tour and drank alcoholic beverages in Tobago.

I find that the Charging Party has established by substantial credible evidence that on the second day of Rosh Hashanah, September 27, 2022, Brooke Balchan did not attend any religious service or undertake any religious observance.

I find that the Charging Party has established by substantial credible evidence that on the second day of Rosh Hashanah, September 27, 2022, Brooke Balchan went on a two and one half hour horseback ride in Tobago.

I find that the Charging Party has established by substantial credible evidence that on the second day of Rosh Hashanah, September 27, 2022, Brooke Balchan spent the entire afternoon on the beach in Tobago.

I find that the Charging Party has established by substantial credible evidence that on the evening of September 27, 2022, the end of Rosh Hashanah, Brooke Balchan had dinner at Skewers in Tobago.

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan willfully and maliciously filed more than one false complaint with the Superintendent of schools against her supervisor, Dr. Joyner.

I find that the Charging Party has established by substantial credible evidence that because of the Respondent's fraudulent formal complaints against Dr. Joyner, the District was required to needlessly expend time, money and personnel resources to conduct an investigation, which concluded the allegations were unfounded.

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan willfully and maliciously filed a false complaint with the Superintendent of schools against a clerical staff member, Natalie Ali.

I find that the Charging Party has established by substantial credible evidence that because of the Respondent's fraudulent formal complaint against Natalie Ali, the District was required to needlessly expend time, money, and personnel resources to conduct an investigation, which concluded the allegations were unfounded.

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan repeatedly sent unprofessional and untrue emails to staff and administrators.

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan received a written directive on March 15, 2023, from the Superintendent of schools that she was not permitted to be on any District property without the Superintendent's express written permission.

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan, on March 19, 2023, willfully refused to comply with the Superintendent's directive by intentionally attending a school function on District property without permission.

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan, on March 19, 2023, walked through the crowded gym holding up a sign reading "zero tolerance for antisemitism."

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan was directed on October 2, 2022, to use the chain of command and not write directly to the Board of Education.

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan willfully ignored the directive of October 2, 2022.

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan was directed on October 27, 2022, to refrain from communicating with the Board of Education on routine work related matters.

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan willfully ignored the directive of October 27, 2022.

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan had been provided, prior to the start of the 2022-2023 school year, with a detailed job description enumerating her responsibilities as Medical Director for the District.

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan, from September 19, 2022, through to the date of the instant charges, willfully refused to perform all of the duties and responsibilities of Medical Director as directed and as set forth in her job description.

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan, during the 2022-2023 school year, repeatedly willfully refused to approve leave requests for numerous members of the nursing and clerical staff without justification.

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan willfully and without cause cancelled existing medical orders necessary for staff nurses to employ Narcan and epinephrine during medical emergencies.

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan did not issue valid medical orders for the nursing staff to employ Narcan and epinephrine during a ten-day period endangering the health, safety and welfare of students.

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan willfully and without cause refused to approve the purchase for $65.00 of medical grade tubing to be used in an emergency for a special needs student with a feeding tube.

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan willfully and without cause refused to support the nurses' decision to exclude a student who lacked all required immunizations.

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan willfully and without cause refused to properly advise a school administrator involved in a medical emergency with a student, the protocol for accompanying the student in the ambulance.

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan intentionally misrepresented and concealed known facts in violation of Education Law 6530.

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan is guilty of incompetence and dereliction of duty.

I find that the Charging Party has established by substantial credible evidence that Brooke Balchan is guilty of misconduct, including insubordination.

## RECOMMENDATION

Some of the specifications in each of the charges essentially allege the same acts.  I acknowledge that the Respondent cannot receive, and my recommendation does not reflect, an enhanced punishment because she was separately charged for the same or similar offenses (*Matter of Donofrio v. Spinnato*, 144 AD2d 672 [2d Dept, 1988]).

The penalties which I can recommend in this proceeding are limited by statute.  I can recommend a reprimand; the imposition of a fine; up to a two-month suspension without pay; demotion in grade and title; or dismissal from service.  I have made no recommendation regarding referring the issue of perjury to the District Attorney and the question of medical malfeasance to the appropriate medical board as both are beyond my purview.  I have relied on the particular circumstances defined in my findings; the counseling memos and notice given to the Respondent regarding her conduct; the prior finding of misconduct and incompetence; and the principles of progressive discipline in formulating my recommendation for an appropriate penalty.

Generally, the principles of progressive discipline contemplate providing an employee remedial feedback by means of increasingly formal steps to ameliorate conduct which does not conform to the employer's performance standards.  The evidence adduced at the hearing established that Dr. Balchan had been repeatedly counseled regarding the District's expectations for her job performance and had been provided a written job description setting forth the specific duties and responsibilities entrusted to the Medical Director.  On August 8, 2022, after a hearing in which Dr. Balchan appeared with counsel, she was found guilty of incompetence and misconduct.  The findings after that hearing included a determination that Brooke Balchan had been willfully derelict in her duties as Medical Director.  A letter of reprimand was issued after the hearing setting forth in significant detail the District's expectations for Dr. Balchan's future job performance. At a reentry meeting on September 19, 2022, Dr. Reynolds let Dr. Balchan know that the entire administration was looking for a fresh start and he demonstrated that everyone was willing to work with her to make her return to work successful.  Dr. Balchan wasted no time in rejecting the spirit of reconciliation and cooperation by lying to the administrative staff about her proposed leave.  Her conduct immediately after her return from her weeklong unauthorized absence and for the balance of the school year cascaded into an unfathomable timeline of misconduct, incompetence, dereliction of duty, insubordination, false swearing, false complaints, character assassination and disruptive behavior.  At the core of her professional descent was her fanciful depiction of herself as a persecuted Jew who was being punished for taking time off to practice deeply held religious beliefs which the overwhelming evidence revealed was a delusional lie.  In addition to willfully refusing to perform her responsibilities as Medical Director, the Respondent aggressively waged a continuous internal and public campaign against administrators by making denigrating and irresponsibly false accusations against them.  The Respondent's venality extended to the students that, as Medical Director, she was charged with protecting.  When an administrator sought guidance during a medical emergency regarding the protocol for accompanying a student in an ambulance, the

Respondent flippantly suggested that a meeting should be scheduled about that and declined to provide the needed medical guidance.  The Respondent callously cancelled medical orders for the administration of Narcan and epinephrine and allowed ten days to elapse before reinstating them, exposing students to a potentially life-threatening situation.

It is difficult to characterize the incomprehensible pattern of Respondent's insubordination, misconduct, incompetence, dereliction of duties, retaliation, malfeasance, retribution, false swearing and casual lying.  It is certainly despicable.  It is undoubtedly unprofessional.  Her aspersions emanating from her unauthorized vacation in Tobago should be offensive to Jews who have been actual victims of antisemitism and have not cried wolf in defense of otherwise indefensible conduct.

The counselling elements of progressive discipline only work if an employee is willing to acknowledge behavior that does not meet the District's expectations and is willing to reform that behavior.  The pattern of misconduct, insubordination, incompetence, dereliction of duty and false swearing by the Respondent is the antithesis.  As of this date, Brooke Balchan has not acknowledged any wrongdoing and continues to blame her travails on a phantom cabal of antisemites. The extent of the Respondent's misconduct, insubordination, incompetence, dereliction of duty and false swearing establishes a fundamental unwillingness to comply with her ethical and contractual obligations as Medical Director.  During the 2022-2023 Brooke Balchan consistently refused to acknowledge her misconduct, insubordination, dereliction of duty and incompetence and repeatedly maliciously maligned others with false accusations of harassment and religious discrimination.  That pattern of conduct, so conclusively established in the record, proves that Brooke Balchan is beyond rehabilitation and supports the conclusion that, if permitted, she would engage in similar conduct in the future; would provide little meaningful service as Medical Director; and would burden the District and its staff with her poor work performance and disruptive, malicious behavior.

The District seeks to terminate Dr. Balchan from her position.  Such a penalty under all the circumstances presented is not so disproportionate to the myriad offenses committed and the complete lack of contrition as to be shocking to one's sense of fairness.

Based on all the circumstances presented, I find that the only appropriate outcome herein for Brooke Balchan's incompetence, dereliction of duty, insubordination and misconduct is dismissal from service.

For all the foregoing reasons I recommend that the penalty of dismissal from service be imposed against Brooke Balchan.

Dated: September 30, 2023

Respectfully submitted,
Kenneth Bernstein, Hearing Officer